**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **JONI COCKRILL** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Case No. 3:13-cv-00587** |
| | § | **JURY DEMANDED** |
| **METROPOLITAN GOVERNMENT OF NASHVILLE, DAVIDSON COUNTY, TENNNESSEE;** | § | |
| | § | |
| **Defendant.** | § | |

**SECOND AMENDED COMPLAINT**

**COMES THE PLAINTIFF, JONI COCKRILL**, and files this Second Amended Complaint against the Defendant, METROPOLITAN GOVERNMENT OF NASHVILLE, DAVIDSON COUNTY, TENNESSEE. She shows:

## I. PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, Joni Cockrill, is a citizen and resident of Smyrna, Tennessee.

2. Defendant, Metropolitan Government of Nashville, Davidson County, Tennessee, is an employer of more than fifteen persons, operating in Nashville, Davidson County, Tennessee, and it employed the Plaintiff.

3. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331; Section 504 of the Rehabilitation Act, 29 U.S.C. §794; the First Amendment rights under 42 U.S.C. §1983; and the Americans with Disabilities Act, 42 U.S.C. §12111, et seq. Venue is proper because the alleged acts in this lawsuit occurred in this judicial district and/or because the

Defendant conducts business in this judicial district. For her claims under the ADAAA, which require EEOC and DOJ exhaustion, Plaintiff has exhausted those administrative prerequisites, receiving a Notice of Right to Sue dated April 18, 2014, and filing this (Second Amended) Complaint within ninety days thereafter.

## II. FACTUAL BASES FOR SUIT

4. Cockrill was employed by Metropolitan Government of Nashville, Davidson County, Tennessee ("Metropolitan Government") beginning in July of 1998, and at the Antioch Middle School beginning August 2002. She had a fine employment history and positive reputation.

5. Cockrill worked as a licensed special education teacher to profoundly disabled special education students. These students were the beneficiaries of federal funding through Defendant subject to Section 504 of the Rehabilitation Act and the ADA.

6. In 2011, a new principal, Dr. Canidra Henderson, was assigned to the Antioch Middle School. Henderson was Cockrill's supervisor.

7. Cockrill engaged in advocacy for the free and appropriate public education (FAPE) of disabled children in the school. Her advocacy, set forth more fully in the following paragraphs, constitutes "protected activity" against retaliation under Section 504 and the Americans with Disabilities Act, with amendments (ADAAA). Her advocacy, below, also involved matters of public concern under the First Amendment as she was speaking as a private citizen concerned about the needs of society's most vulnerable: disabled children.

8. In August of 2011, Cockrill reported to the Metropolitan Nashville Board of

Public Education[1], and in particular to Principal Henderson, that disabled and medically fragile special education students in her classroom, ones with respiratory and seizure disorders, were in danger due to environmental concerns of mold and/or asbestos in the classroom. She explained that an abatement had been performed over the summer but that the substance is still visible on special ed equipment—endangering those students.

9. Also in August of 2011, Cockrill reported to the Metropolitan Nashville Board of Public Education, and in particular to Antioch Middle School's Exceptional Education Department staff, that a disabled child required transportation services as part of his Individual Education Plan (IEP). Additionally, Cockrill began what would become multiple complaints about inadequate staffing and assistance to students with special needs. In particular, an ancillary aide was an IEP requirement in one case in particular.

10. In December of 2011, Cockrill also reported to Metropolitan Nashville Board of Public Education, and in particular to Henderson, of recurring problems with a hot water heater necessary for cleansing a child with special needs. Specifically, the cold water was a problem for a special needs student who, due to her disability, would wipe her own feces on her body. This student *required* warm water for sanitation.

11. In January of 2012, Cockrill reported understaffing concerns relating to the needs of special education students. Cockrill reported that she needed help with diapering, had no assistant, and could not even leave to go the restroom for herself. She explained that the students in her classroom—a self contained "Life Skills" class—had "extreme needs (wheelchair, diapers,

[1] Pursuant to Section 1.01, 9.01 and 9.03 of the charter of the Metropolitan Government of Nashville, Davidson County, Tennessee, the Metropolitan Government created the Metropolitan Nashville Board of Public Education and establishes its powers and duties. However, pursuant to the same charter, suit may only be brought

physical aggression, autism, and severe cognitive deficits."). She therefore requested help to meet their needs.

12. In February of 2012, Defendant, through Henderson, accused Cockrill of encouraging parents of special needs children to make complaints if they were not receiving appropriate services. Cockrill responded to Henderson that she *supported* those parents' decisions, causing Henderson to become angry.

13. By April of 2012, staffing needs had not changed, prompting Cockrill to again report to Henderson the need for additional support and supervision—during physical education, arrival and whenever a paraprofessional is absent. She reported that, in the past, two assistants were utilized and, since that time, the child who eats and smears her feces cannot be handled in light of the simultaneous demands from the others in physical education and the one in a wheelchair (who must be navigated over ramps, closed doors, and into buildings). Thus, Cockrill plainly reported that "two people are needed at all times with our students, and the times that additional support and supervision is needed is: upon arrival, … during PE... and lunch…" With only one aide in physical education, when one child required bathrooming, all of the children went with her, denying them their important inclusion class of physical education.

14. In April of 2012, close-in-time to Cockrill's reports—and *because of* her protected activity—Defendant, through Henderson, plotted to terminate her employment through unannounced observations and by placing her on an Intensive Assistance Plan (IAP). An IAP is a negative performance which subjects one to termination as a condition precedent.

15. Cockrill made a formal appeal of the IAP. In doing so, she stated that procedures

---

against the Metropolitan Government and not the Board of Education itself. For clarity, Cockrill will refer to the Board of Education's actions throughout although the Defendant is the Metropolitan Government.

had not been followed and that the actions taken by Henderson with respect to the IAP were "pure retaliation." Specifically, she explained that requisite instructional observations had not even been performed and that Cockrill's objective scores, being advanced, lent the IAP decision by Henderson to be "unfair and baseless."

16. On May 14, 2012, Henderson stated to Cockrill that she intended to perform the evaluation retroactively—however, a Ms. Ball actually performed it on May 15, 2012. Cockrill received favorable scores through Ms. Ball.

17. Cockrill objected again and, on May 14, 2012, stated to Defendant, through Alan Coverstone (Executive Director of Innovation for Defendant), that Henderson wanted to go back and do an "instruction" observation to retroactively justify the IAP. Cockrill pointedly stated that the IAP was not truly about performance, but was <u>retaliation.</u>

18. Cockrill also objected, on May 14, 2012, that she did not meet criteria for being placed on an IAP because she did not have low scores on a past evaluation or current low scores on an ongoing observation. She also stated that she had been subjected to 16 unannounced "observations" and three unannounced meetings, none of which were to be assistive—and were clearly designed to downgrade her performance (be evaluative).

19. Coverstone, in response, tried to claim the observations were not evaluative at all, but were being offered as "assistance"—which was clearly not the case.

20. Without Cockrill's knowledge at the time, Coverstone sent emails to Henderson (May 23, 2012) about the observations of Cockrill. He told Henderson that an "unannounced" visit on the "last day" [of school] could go forward. He referred to this as the "last chance."

21. Coverstone also told Henderson on May 23, 2012, consistent with Cockrill's

objections: "You cannot use past observations for two reasons: first, they need to follow the process; second, those previous were assistance, not valuation, and we need to maintain that line."

22. Henderson was clearly creating negative documentation against Cockrill to damage her reputation and her employment. She became angry that her attempt was foiled.

23. May 24, 2012 was the last day of school, lasting only three hours. By this time, very little if any teaching was conducted and, in fact, Defendant had packed up the textbooks. It was a day typically for saying goodbyes and well wishes. Nevertheless, on that very day, Defendant did conduct an "unannounced observation" of Cockrill's teaching and then gave "observer scores" which ranked Cockrill with 1s and 2s. Cockrill objected that an observation on the very last day of school without books which is obviously atypical, and when her assistant was late, and she was short staffed, was patently unfair. Cockrill also reported that her previous observation from May 15, 2012 (by a Ms. Ball) was more reflective.

24. By email of May 25, 2012 with a subject line of "Joni," Coverstone informed Henderson that "I hope you have documented some of the times you went to observe her, but she asserts that she did not have her first Instruction Observation" until after I met with her, that Ms. Ball did it, and that it looked great." Coverstone concluded that he was concerned the process may pose problems that will keep us from doing what we need to for the students.

25. By July of 2012, Cockrill reported to Defendant that Henderson was denying her assistants for special education students and that, as a result, IEP services for special needs children were going unmet.

26. On July 7, 2012, Cockrill also reported to Defendant's Dr. Barry N. Potts,

Defendant's Staffing Liason, that she had experienced "Retaliation/Discrimination" and requested a transfer away from Henderson's school. Cockrill listed her certifications in Special Ed, English as a Second Language, and Psychology, and suggested examples. She said "please consider my request for help." However, no such help was extended to her.

27. Also, in July of 2012, Cockrill reported to Defendant that ADA accessibility issues for students with disabilities must be addressed. Specifically, she wrote on July 31, 2012, with copy to Henderson, with a subject line of "critical issues for students with disabilities," that the bathroom does not accommodate a diaper changing table, that the bathroom is too small for a student's wheelchair, that the bathroom lacks hot water, that supervision is needed for students (providing specific examples).

28. In August of 2012, Cockrill reported to Defendant, including Henderson and others, that further staff support is needed for students with high needs. She also reported, via email of August 7, 2012, that the lack of help is resulting in violence—specifically that one student assaulted another student, threw objects, flipped desks, and assaulted Cockrill. Cockrill sounded the alarm of needing additional staff to meet the needs of students and her own safety: "There is no way I can be left alone—I will not be able to protect the students or myself." Cockrill stated that she does not feel it is safe and that more support is needed.

29. On August 9, 2012, Cockrill requested that Henderson allow her to do co-teaching/resource because: "I need a break from having to be in the adversarial position of always having to advocate and ask for help for the students receiving life skills." Cockrill suggested that it might be beneficial for Henderson to hear this advocacy from another person. However, Henderson responded merely that the request was received, staffing has not been

discussed, and the department will be informed about any determination.

30. Also, on August 9, 2012, Henderson was informed by the ADA Compliance officer for Defendant (Henry R. Flenory) that accommodations in Cockrill's classroom which she had requested in July was meritorious. Things provided would include: a changing table; an accessible toilet and hand rail; and clinic restroom as the primary location for changing students. Additionally, the school was said to be "in line for a renovation which will make the total building accessible." Henderson was instructed to discuss these with Cockrill.

31. On or about August 17, 2012, still without adequate assistance, Cockrill was foreseeably injured by a student who assaulted her. As a result of her injury, Cockrill's ability to assist with restraints and physical altercations was compromised. Therefore, by email of August 20, 2012, Cockrill yet again requested assistance by writing an email to Henderson which stated: Can we arrange to have support in my classroom during the times that an assistant is not assigned in case [child] gets physically aggressive again?"

32. In response to the staffing request, on August 21, 2012, Charishma Price (Defendant's Instructional Facilitator) noted the need for more staff "has been forwarded and discussed with the department" but suggested a "more proactive approach" with the child.

33. Cockrill responded, also on August 21, 2012, that "proactivity" was fine, but that the four teachers/staff members had been assaulted in the first three weeks of school, that restraints had *not* been used, and that she was trying to "duck and dodge feces, fists, and items she throws" and trying to protect the students from assaults. She noted that a mother of the child suggested a one-on-one assistant and, Cockrill stated that the child did well in the past with two assistants.

34. Additional assaults by the child occurred on August 22, 2012.

35. On August 22, 2012, Cockrill again formerly requested from Defendant, including Henderson, additional staffing for students with special needs in her classroom. She stated: I would like to request that an assistant be allowed to assist and support in my class due to the increasing acts of physical aggression. I need help." She also stated that a child had another episode of physically attacking others.

36. On August 23, 2012, Cockrill also requested that Henderson, along with others, consider her request for a reasonable accommodation in the form of reassignment under the ADA. By this time, due to the assaults, Cockrill had a "disability" as that term is defined by the ADAAA—that is, her injury was a musculoskeletal "impairment" (to her spine) which substantially limited Cockrill in the major life activities of lifting, bending, and working her current position, a position which required physical assistance of students and restraint of students. In addition to the physical impairment, Cockrill suffered post traumatic stress disorder, a mental "impairment" which affected her concentration, focus, and clarity in that classroom environment where she was assaulted. In requesting reasonable accommodation, Cockrill stated that she was physically no longer able to lift students out of wheelchairs, engage in bending and stooping, and protecting herself against physical attacks. As part of the interactive process, she suggested reassignment to inclusion/co-teaching classes. On August 28, 2012, Cockrill also submitted the appropriate ADA paperwork ("ADA Request for Reasonable Accommodation") to Defendant, through Mr. Henory Flenory, with copy to Henderson.

37. On August 28, 2012, Mr. Flenory, the ADA Compliance officer, responded that accommodations "are covered under Title I of the ADA Law" and that "*Harold Finch* is the

person that is responsible for this area."

38. On September 6, 2012, Cockrill reported to Henderson and Finch that she had received the reports of her MRI and the results were "worse than expected"—two ruptured discs at L4 and L5.

39. Cockrill was placed on a leave of absence beginning on or about August 31, 2012. While on the leave of absence, Cockrill continued to request reassignment as a reasonable accommodation so that she could return to *active work*. However, Defendant repeatedly refused her attempts at returns, denying her many open and available positions, and just leaving her on leave status. Defendant, through Henderson, would state, as she did on November 16, 2012, "all positions have been assigned."

40. On November 23, 2012, as part of the interactive process to obtain a reasonable accommodation, Cockrill conferred by email with Nancy Sue Apple (Defendant's Workplace Safety Assistant) about returns to work. Whereas Flenory had advised Cockrill thatn Harold Finch handled ADA issues, Apple advised Cockrill that *Henderson* was charged with returns to work and managing medical restrictions.

41. On November 28, 2012, Cockrill wrote to Henderson and to Finch, and others, that she was ready to return to work through reassignment which accommodates her restrictions. She outlined many positions which would enable this. Finch responded by email that Henderson "appreciates your input" and that she is charged to place teachers were they are the "best fit." No reassignment occurred, and Cockrill was left on leave status.

42. In January of 2013, having not been reassigned, Cockrill and her doctor agreed she could at least do a "trial run" at a return to work at her previous position.

43. On or about January 7, 2013, having returned to work, Cockrill learned that inadequate staffing still existed. Upon her return to work, she was assaulted by a student again. On January 17, 2013, the student placed Cockrill in a headlock and hit her in the back of the neck, reaggraving her spinal injury. The student was suspended for two days. But on January 28, 2013, the student assaulted Cockrill yet again, causing her to be treated at the emergency room for a head injury and further aggravation to her back injury from the original assaults.

44. On or about February 6, 2013, Cockrill made a request to Defendant, including Henderson, for an IEP meeting to discuss "the need for a 2 person CPI trained staff (per IEP and BIP[2] / Safety Plan").

45. On February 7, 2013, Cockrill again made a request for reassignment under the ADA by writing to Finch and Henderson and others. She reiterated the August 2012 injury and the two ruptured/slipped discs in her spine. She outlined the subsequent assaults upon her return to work, along with the inadequate staffing. She stated: "Put yourself in my shoes…if you had a bad back and nerve damage, would you want to be faced with having to defend yourself against more attacks or have to restrain physically aggressive teenagers? I am terribly anxious and afraid of getting hurt again." She closed by again asking for reassignment to a less physically demanding position.

46. Instead of reassigning Cockrill, Defendant, through Henderson, responded on February 8, 2013 that she must stay on a leave of absence until the "restrictions have been lifted or relieved." To Henderson, reassignment did not exist and "fully healed" was expected, a violation of the ADAAA.

47. In April of 2013, Cockrill contacted Defendant's Officer of Human Capital, Dr.

Barry Potts, and requested that he assist in reassignment to a less physically demanding position. Cockrill outlined numerous positions within the system which could be possible. However, in response, Dr. Potts stated that "it is up to the teacher to ecure [sic] the transfer. You may send your resume to any school or principal where you would like to work."

48. On May 29, 2013, Cockrill requested Henderson reassign her to an English as a Second Language position because it would accommodate her disability. She explained she has 15 years of experience and is certified in both ESL and Secondary English. However, Henderson responded: "Ms. Cockrill, the position has been filled. Thank you for your interest." Upon information and belief, Ms. Cockrill was more qualified for this position.

49. In June of 2013, Cockrill requested reassignment to ESL and EE Inclusion at Antioch High School, and requested a reassignment from Finch and Potts. In response, Potts stated she must "go through Mr. Finch and OJI personnel for clearance."

50. So, Cockrill returned to Finch and advised Finch that she had permanent medical restrictions which limited her from a type of work involving "physical restraint." She requested the ESL and EE Inclusion position.

51. On July 1, 2013, Finch responded: Please be advised that per your restriction being accommodated, a principal offering you a new assignment, and your current principal releasing you, you are allowed to be reassigned to a new position." But beyond stating "you are allowed," Finch did not assist in the implementation of a reassignment.

52. On July 1, 2013, Cockrill reiterated that she was seeking an ADA reassignment and asked what she needs to do. Finch responded, on July 3, 2013, that his office "does not transfer/reassign employees for any reason. That is outside WSO's scope of authority." He then

---

[2] Behavior Improvement Plan.

copied Henderson "to make her aware of your accommodation concerns."

53. No reassignment was given to Cockrill, who was left on leave. She realized that no one would take responsibility for actually assisting her with obtaining a reasonable accommodation of reassignment. She was being sent emails pointing her in different directions, often times contradictory.

54. In January of 2014, Defendant, through Finch, advised Cockrill that she is going to be placed on "unapproved leave of absence once all accrued leave has been exhausted."

55. On January 31, 2014, Cockrill reported to Craig Ott, Defendant's Executive Director of Human Capital Operations, that she was requesting reassignment. She explained that she sought help from Flenory who referred her to Finch who stated he was not able to reassign and referred her back to Henderson. Cockrill asked Ott if the ADA Coordinators cannot assist with reassignment, who can? Ott indicated he would look into it, but did not meaningfully respond.

56. Receiving no assistance from Finch or Henderson or Flenory or Ott, Cockrill next turned to Susan Thompson, Chief Human Capital Officer, in February of 2013. On February 6, 2014, Cockrill requested Thompson's assistance with reassignment, noting her history of assaults, expiration of leave, and a vacant position at Can Ridge High. But, again, Cockrill received no assistance.

57. On February 6, 2014, Karen Jones, Leave Administrator for Employee Benefits, advised Cockrill that she must be "released to return to full duty without restrictions before you will be allowed to return to work." This was consistent with Henderson's belief that "fully healed" is required for a return, a violation of the ADAAA.

58. On February 14, 2014, Cockrill contacted Henderson by email and stated that she had been advised that she was required to be released "fully duty with no restriction" but that she *had a restriction*. Henderson turned the matter back over to Finch and Scott Lindsey.

59. On February 14, 2014, Cockrill also wrote to Defendant, through David W. Hines, Defendant's Director of Benefits, with a copy to Finch, again reiterating her injuries, qualifications, need for reassignment, and possible positions. Hines responded *that Finch* would handle issues regarding accommodation—even though Finch had already said otherwise.

60. In March of 2014, Cockrill provided even further information about the nature of her disability and need for accommodation to Finch. This included a functional capacity report and information from her treating physician. She indicated there were at least seven positions open and available for which she qualifies. She noted that hundreds of other positions will come open in the coming weeks.

61. In April of 2014, too, Cockril requested to Defendant still more position for which she was qualified and that that were posted. She received no response. To this date, and despite the presence of this lawsuit, Cockrill has not been placed despite her continuing efforts. She has just received a continuous runaround, contradictory statements, and misdirection. As a result, she has lost her job, her pay, and has suffered significant emotional distress.

**COUNT I: DISCRIMINATION/DENIAL OF REASONABLE ACCOMMODATION UNDER ADAAA**

62. The foregoing facts are incorporated as if set forth herein.

63. As an individual with a physical impairment (musculoskeltal) which substantially limits major life activities (lifting, bending, pushing, and 'type' of work), and a mental impairment (post-traumatic stress disorder) which substantially limits major life activities

(concentration, focus), Plaintiff suffered denial of a reasonable accommodation despite her overwhelming efforts at reassignment. Defendant's stance of "no restrictions" or "fully healed" also violates the ADAAA.

64. As a result of the refusal to reassign and, instead, placing Plaintiff right back in harm's way without adequate assistance, Plaintiff has suffered physical injury, anxiety, post-traumatic stress, psychological damage, and need for psychiatric support. Her physical health has deteriorated and she is emotionally fragile. She has lost her livelihood and has suffered the loss of benefits, wages, and other job emoluments.

65. Accordingly, Plaintiff brings suit under Title I of ADAAA, with its Amendments, at 42 U.S.C. 12101 et seq.. She seeks an award of declaratory, equitable, nominal, and compensatory relief, along with reinstatement with appropriate accommodation.

## COUNT II: RETALIATION AND RETALIATORY HARASSMENT UNDER SECTION 504 AND THE ADAAA

66. The foregoing facts are incorporated as if set forth herein.

67. Cockrill, a special education teacher, engaged in protected activity of advocacy for special needs children as set forth in detail hereinabove.

68. Because of her advocacy, Defendant engaged in conduct directed at Cockrill which would chill a person of ordinary firmness: It denied her support and assistance needed, foreseeably ignored and allowed her injuries to occur, forced her into a known dangerous environment where she suffered repeated physical injury and trauma, damaged her employment status through IAP status, then left her on leave to deny her active employment instead of reassigning her, and, to this date, has refused her reinstatement. These actions were knowing and intentional, taken against Cockrill because of her advocacy for children who have a disability

and who are entitled to a free appropriate public education under Section 504 and the ADAAA. These children had limited abilities to protect or advocate for themselves. Absent Cockrill's advocacy, these adverse actions would not have occurred.

69. As a result—the proximate and legal cause—of Defendant's reckless indifference, Plaintiff has suffered physical injury, anxiety, post-traumatic stress, psychological damage, andneed for psychiatric support. Her physical health has deteriorated and she is emotionally fragile. She has lost her livelihood and has suffered the loss of benefits, wages, and other job emoluments, and harm to her reputation.

70. Accordingly, Plaintiff brings suit under Section 504, 29 U.S.C. 794(a)(b)(2009) and the ADAAA, at 42 U.S.C. 12203 for retaliation and retaliatory harassment. She seeks an award of declaratory, equitable, nominal, and compensatory relief, along with reinstatement with appropriate accommodation.

**COUNT III: RETALIATION UNDER THE FIRST AMENDMENT AND SECTION 1983**

71. The foregoing facts are incorporated as if set forth herein.

72. Cockrill engaged in constitutionally protected speech, under the First Amendment, in favor of society's most vulnerable: disabled children. Her speech, detailed hereinabove, was undertaken as a private citizen. As a result of her speech, It denied her support and assistance needed, foreseeably ignored and allowed her injuries to occur, forced her into a known dangerous environment where she suffered repeated physical injury and trauma, damaged her employment status through IAP status, then left her on leave to deny her active employment instead of reassigning her, and, to this date, has refused her reinstatement.

73. Defendant's pattern of deprivation of Cockrill's federally protected rights either

resulted from a policy or custom or were undertaken by employees with final policymaking authority. Defendant, with persons such as Henderson and Finch, have a custom and pattern of not only indifference to Defendant's failures to meet the needs of special education children, but a pattern of upbraiding and disciplining and retaliating against a teacher who voices complaints, i.e. labeling her a complainer instead of recognizing her advocacy, ignoring the substance of the complaints, giving her poor evaluations, and exposing multiple teachers (and other special needs children) to physical and emotional harm on a repeating basis.

74. As a result—the proximate and legal cause—of Defendant's reckless indifference, Plaintiff has suffered physical injury, anxiety, post-traumatic stress, psychological damage, need for psychiatric support, and harm to her reputation. Her physical health has deteriorated and she is emotionally fragile. She has lost her livelihood and has suffered the loss of benefits, wages, and other job emoluments.

75. Accordingly, Plaintiff brings suit under the First Amendment and 42 U.S.C. 1983. She seeks an award of declaratory, equitable, nominal, and compensatory relief, along with reinstatement with appropriate accommodation.

76. Plaintiff demands a jury.

WHEREFORE, Plaintiff seeks the following relief:

a) Reinstatement to employment with accommodation;

b) Reimbursement of all wages, benefits and other actual costs and damages;

c) Compensatory damages as a result of Defendant's conduct;

d) Reasonable attorneys fees and costs;

e) Other and further relief as this Court deems just and proper.

Respectfully submitted,

**GILBERT RUSSELL McWHERTER PLC**

/s Justin S. Gilbert
Justin S. Gilbert (TN Bar No. 017079)
Jessica F. Salonus (TN Bar No. 28158)
101 North Highland Avenue
Jackson, Tennessee 38301
Telephone: 731-664-1340
Facsimile: 731-664-1540
jgilbert@gilbertfirm.com
jsalonus@gilbertfirm.com

*ATTORNEYS FOR PLAINTIFF*

**CERTIFICATE OF SERVICE**

I, the undersigned, do hereby certify that on this the 7th day of May, 2014, a true and accurate copy of the foregoing First Amended Complaint has been served via the Court's ECF system on all counsel of registered notice, including to the following:

The Department of Law of the Metropolitan Government of Nashville and Davidson County
Saul Solomon
J. Brooks Fox
Metropolitan Courthouse, Suite 108
P.O. Box 196300
Nashville, Tennessee 37219

/s Justin S. Gilbert_____